Louie ALAKAYAK; Wassillie Andrews; Peter Chernishoff; Agnes Hansen; Jerry L. Hatton; and Christine Monroe, on behalf of themselves and all others similarly situated; Carl W. Evon and David D. Tarabochia, Appellants and Cross–Appellees,

v.

BRITISH COLUMBIA PACKERS, LIMITED; Icicle Seafoods, Inc.; Marubeni Corporation; Marubeni America Corporation; Nelbro Packing Company; Nichirei Corporation; Nichiro Corporation; Nippon Suisan Kaisha, Ltd.; North Pacific Processors, Inc.; Ocean Beauty Seafoods, Inc.; Okaya & Company, Ltd.; Okaya (USA), Inc.; Okaya (Canada) Company, Ltd.; Peter Pan Seafoods, Inc.; Trident Seafoods Corporation; Unisea, Inc.; Wards Cove Packing Company, Appellees and Cross–Appellants.

Nos. S–9259, S–9359.

Supreme Court of Alaska.

May 31, 2002.

Phillip Paul Weidner, Phillip Paul Weidner & Associates, Inc., Anchorage, Bruce F. Stanford, Law Offices of Bruce F. Stanford, Anchorage, Stephen D. Susman and Parker C. Folse III, Susman Godfrey, L.L.P., Seattle, Washington, and Frederick P. Furth and Bruce J. Wecker, The Furth Firm, San Francisco, California, for Appellants and Cross–Appellees.

Douglas J. Serdahely, Patton Boggs, L.L.P., Anchorage, Liaison Counsel for Certain of Processor Appellees and Cross–Appellants British Columbia Packers, Limited, Nelbro Packing Company, Icicle Seafoods, Inc., North Pacific Processors, Inc., Unisea, Inc., and Wards Cove Packing Company.

James N. Reeves, Dorsey & Whitney, L.L.P., Anchorage, and Richard M. Clinton and Joseph Klein, Dorsey & Whitney, L.L.P., Seattle, Washington, for Appellees and Cross–Appellants Nichirei Corporation and Unisea, Inc., and also on behalf of all importer Appellees and Cross–Appellants Marubeni Corporation, Marubeni America Corporation, Nichirei Corporation, Nichiro Corporation, Nippon Suisan Kaisha, Ltd., Okaya & Com-

pany, Ltd., Okaya (USA), Inc., and Okaya (Canada) Company, Ltd.

William M. Wuestenfeld and Michael D. Corey, Sandberg, Wuestenfeld & Corey, Anchorage, Dexter A. Washburn, Law Offices of Dexter A. Washburn, Seattle, WA, and Geoffrey P. Knudsen, Law Offices of Geoffrey P. Knudsen, Seattle, Washington, for Appellees and Cross–Appellants British Columbia Packers, Limited and Nelbro Packing Company.

Robert L. Richmond and Daniel T. Quinn, Richmond & Quinn, Anchorage, and James L. Magee and David C. Lundsgaard, Graham & Dunn, Seattle, Washington, for Appellee and Cross–Appellant Icicle Seafoods, Inc.

James N. Leik, Perkins Coie, L.L.P., Anchorage, and David J. Burman and Brent Snyder, Perkins Coie, L.L.P., Seattle, Washington, for Appellees and Cross–Appellants Marubeni Corporation, Marubeni America Corporation, and North Pacific Processors, Inc.

David B. Ruskin, Anchorage, and Michael E. Kipling, Phillip H. Ginsberg, and Carl J. Marquardt, Stokes Lawrence, P.S., Seattle, Washington, for Appellees and Cross–Appellants Nichiro Corporation and Peter Pan Seafoods, Inc.

Clay A. Young, Delaney, Wiles, Hayes, Gerety & Ellis, P.C., Anchorage, and Albert R. Malanca, Thomas J. Greenan, and Kenneth Kieffer, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Tacoma, Washington, for Appellee and Cross–Appellant Nippon Suisan Kaisha, Ltd.

Kenneth P. Eggers, Groh Eggers, L.L.C., Anchorage, and Robert J. Adolph, Adolph & Gamache, P.S., Seattle, Washington, for Appellee and Cross–Appellant Ocean Beauty Seafoods, Inc.

Mark E. Ashburn, Ashburn & Mason, Anchorage, and Richard E. Donovan and Nicholas J. Panarella, Kelley, Drye & Warren, L.L.P., New York, New York, for Appellees and Cross–Appellants Okaya & Co., Ltd., Okaya (USA), Inc., and Okaya (Canada) Co., Ltd.

Jeffrey M. Feldman, Susan Orlansky, and Ruth Botstein, Feldman & Orlansky, Anchorage, and Ralph Palumbo and Lynn M. Engel, Summit Law Group, Seattle, Washington, for Appellee and Cross–Appellant Trident Seafoods, Inc.

Bruce E. Falconer, Hicks, Boyd, Chandler & Falconer, Anchorage, and Douglas M. Fryer and Jeffrey L. Jernegan, Mikkelborg, Broz, Wells & Fryer, Seattle, Washington, for Appellee and Cross–Appellant Wards Cove Packing Company.

Richard J. Todd, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Amici Curiae States of Alaska, Hawaii, Minnesota, Nevada, New Mexico, and West Virginia.

Before: FABE, Chief Justice, MATTHEWS, and BRYNER, Justices.

· *OPINION*

FABE, Chief Justice.

## I. *INTRODUCTION*

A class of commercial sockeye salmon fishers who fished in Bristol Bay between 1989 and 1995 brought an antitrust action under the Alaska Antitrust Act against salmon processors and importers who allegedly conspired to depress the prices paid to fishers for raw salmon. After the class settled with some defendants, the superior court granted summary judgment as to all other defendants, holding that the plaintiffs had failed to present evidence sufficient to raise a genuine issue of fact as to whether a price-fixing conspiracy existed. After summary judgment was entered, the prevailing defendants requested an award of attorney's fees and costs under Alaska Civil Rules 79 and 82; however, the superior court denied this request. The plaintiff class now appeals the grant of summary judgment. The defendants cross-appeal the denial of attorney's fees, as well as the superior court's ruling construing the statute of limitations for antitrust actions, AS 45.50.588, to allow the plaintiffs to recover damages sustained during the course of the entire alleged conspiracy.

## II. *FACTS AND PROCEEDINGS*

### A. *Characteristics of the Bristol Bay Sockeye Salmon Industry*

The plaintiffs in this case are a class of commercial fishers who held limited entry

permits and fished for sockeye salmon in the Bristol Bay fishery during the seven seasons between 1989 and 1995. The thirteen defendants are processors of salmon, who purchased the raw salmon directly from the fishers, as well as importers, who purchased processed salmon from the processors for later importation and distribution in Japan. The processor defendants are: British Columbia Packers, Ltd./Nelbro Packing Co. (Nelbro);[1] Icicle Seafoods, Inc.; North Pacific Processors, Inc. (NPPI); Unisea, Inc.; Wards Cove Packing Co.; Trident Seafoods Corp.; Peter Pan Seafoods, Inc.; and Ocean Beauty Seafoods, Inc. The importer defendants are: Marubeni Corp./Marubeni American Corp. (Marubeni); Nippon Suisan Kaisha, Ltd. (Nissui); Nichirei Corp.; Okaya & Co., Ltd./Okaya (USA), Inc./Okaya (Canada), Ltd. (Okaya); and Nichiro Corp.

Most fishers in Bristol Bay enter into unwritten agreements with processors to be part of a processor's "fleet." The processors commonly guarantee that they will purchase some or all of their fleet's harvested salmon and provide important services to their fleet, including fuel and provisioning. Many fishers switch from one processor's fleet to another between seasons.

The processors buy the raw salmon from the fishers at a single, homogeneous price per pound that does not change depending on the size, sex, or quality of the salmon harvested. The price paid per pound by the processors to the fishers varied between processors, but the prices generally had three components: (i) an initial in-season[2] price, with or without adjustments during the season, (ii) a post-season "adjustment," and (iii) a "loyalty bonus."[3] The defendant processors are all within the top ten largest processors operating in Bristol Bay, who collectively bought between 70.7% and 77.2% of the total salmon output between 1989 and 1995. The defendant importers together purchased between 21.7% and 36.4% of the Bristol Bay salmon between 1989 and 1995.

The procedure for setting the prices paid for raw salmon varied from season to season and from processor to processor. Some processors announced an in-season price before the season opened, while others required their fleets to fish on an "open ticket," with only a nominal price or even no announced in-season price at the start of the season. Once announced, the in-season price was sometimes adjusted during the season. After the season ended, the processors would sometimes issue a post-season "adjustment" to the in-season price, which would replace or modify the prices already set for the season. In addition, some processors also issued to some or all of their fishers a "production" bonus, based on a fisher's number or volume of deliveries, and a "loyalty" bonus, based on factors determined by the processor. During the season, the in-season prices paid by different processors were a topic of frequent discussion among fishers, who found out about the prices through word of mouth, from local media, from processor postings on tenders receiving fish, and on company bulletin boards.

After the raw salmon was purchased and processed by the processors, it was in turn resold to importers. All of the importer defendants in this appeal purchased salmon for export to Japan. These Japanese importers maintain access to the Bristol Bay salmon through contracts with processors and through direct ownership—three of the importer defendants own three of the processor defendants.[4]

### B. *The Alleged Conspiracy*

From 1984 to 1988 total prices paid by the defendant processors for raw salmon in Bristol Bay climbed dramatically until they reached over $2.00 per pound. In the 1989 season these prices fell to about an average

---

1. "British Columbia Packers" and "Nelbro" are essentially the same entity; British Columbia Packers is the exclusive sales agent, while Nelbro conducts processing operations.

2. Some documents in the record refer to the in-season price as the "ground[s]" price, or "ex vessel" price.

3. There were also special premiums paid in certain circumstances—for example, for low-volume catches kept fresh in refrigerated seawater.

4. Marubeni owns NPPI; Nissui owns Unisea; Nichiro owns Peter Pan.

of $1.33 per pound; between 1989 and 1995 the average never rose above this level, falling to about $0.63 per pound in 1995.[5]

The defendants presented evidence supporting an innocent explanation for the decline. An expert witness for the defendants maintains that the decline was caused by a worldwide salmon glut that began in 1988. And, a U.S. General Accounting Office report gave three reasons for the decline in prices: the large size of the Bristol Bay catch, a glut in Japan, and the importance of farmed salmon in the Japanese market.

However, the plaintiffs claim that this decline in prices paid to fishers is the result of a price-fixing conspiracy between all or many of the large processors in collusion with importers. The plaintiffs contend that there is both direct and circumstantial evidence of this conspiracy.

### C. The Elements of the Alleged Conspiracy

■ The plaintiffs make three general claims: (1) that the processors agreed among themselves to fix current and future prices for raw salmon; (2) that the major processors and importers engaged in strong-arm tactics to force smaller processors to accept lower prices; and (3) that importers attempted to manage, organize, and coordinate processor efforts to lower prices. The evidence marshaled to support these theories is briefly summarized here.[6]

#### 1. Agreements between processors to fix current and future prices

The plaintiffs claim that evidence in the record shows that the defendant processors agreed to fix current and future prices at various times between 1989 and 1995.

#### a. Torres statement concerning 1991 actions

In a deposition, NPPI employee Robert Torres was asked about the processors' offer of a $0.70 in-season price on or about July 3, 1991. Torres stated that on or about July 3, "[b]asically everybody" offered that price, and added, "[w]ell, they just agreed that they'll pay 70 cents."

#### b. "Price verification" phone calls

The processors engaged in "price verification" phone calls to verify each other's posted in-season prices. Processor employees and officers testified that in these phone calls they called each other simply to confirm rumors of the prices that other processors were offering as in-season prices.

A Nelbro representative testified that these calls were "fairly common." These calls were generally limited to a request to verify a posted price and either a yes or no answer or a refusal to respond. However, some of the written notes made by participants in these conversations do indicate that other topics—such as the general characteristics of the run or the season, and perhaps in-season processor prices generally—were sometimes discussed.[7] Also, a former employee of a nonparty processor claimed that price verification discussions "would usually lead into general discussions about the grounds prices being paid by all processors of Bristol Bay sockeye." This was generally

---

**5.** "Averages" of $2.10 (1988), $1.25 (1989), and $0.68–$1.12 (1994–1995) were calculated by one of the plaintiffs' experts and were marked as the average "ex vessel" price for those seasons.

**6.** Because this is a review of a grant of summary judgment, we draw all reasonable inferences in favor of the non-movant, the plaintiffs. See *Moore v. Allstate Ins. Co.*, 995 P.2d 231, 233 (Alaska 2000).

**7.** Notes from a June 26, 1992 conversation between Nelbro and Wards Cove representatives state: "[Nelbro's] Trev [Beeston] calls—[Peter Pan's] Roos [Van Vactor] thinks large run—Trev looking for export tenders; confirm $." The par-

ticipants apparently talked briefly about the quality of the upcoming run; this is confirmed by testimony from one of these representatives.

Another set of similar notes from a June 17, 1992 conversation between Peter Pan and Nelbro representatives indicate that they discussed the quality and size of the upcoming run, as well as, possibly, what the in-season price would be: "Bay—advance 1.00; close 22nd."

Finally, some notes indicate that there may have been calls between Unisea and Peter Pan representatives on June 20, 1990 concerning "prices and catch" in other fisheries in Port Moller and False Pass. The Unisea representative stated that he made these calls "to give[ ] us an idea of how the run is shaping up."

confirmed by another nonparty processor who described his price verification conversations with nonparties as well as with Trident and Ocean Beauty.[8] Also, another nonparty processor claimed that during a price verification with Nelbro, the Nelbro representative mentioned that "he had confirmed with Trident that [Trident was] paying $1.00."

### c. *Actions during the 1991 strike*

The plaintiffs also claim that the processors engaged in certain collusive price-fixing actions during the 1991 season. During this season there was a "strike" after several major processors attempted to force the fishers to accept open tickets and the fishers refused to fish.[9]

On June 24, 1991, apparently after the strike was underway, handwritten notes by a Wards Cove employee indicate that Wards Cove and Nelbro representatives talked about making a "statement" about the strike; however, the record does not reveal the content, subject, or outcome of that telephone call.

On June 29 a Nelbro representative met with his fishers and asked them to fish under an open ticket, explaining that the importers who were going to buy fish from the processors were only willing to do so during the 1991 season at very low prices. The representative testified that he told his fishers: "The Japanese have indicated that our market with them is going to have to drop drastically." The representative indicated that he was in fact referring to the importer buyers. Other processors apparently also attempted to convince their fishers to fish under open tickets or at low in-season prices.

In the face of continued refusals to fish, the processors offered higher in-season prices. On June 29 Wards Cove and Peter Pan offered an in-season price of $0.50, but these offers were not accepted, although some Peter Pan fishers apparently did set

out to fish. The next day, Ocean Beauty offered an in-season price of $0.65 to its fishers, and this offer was accepted.

On July 1 Trident and Peter Pan matched Ocean Beauty's price, offering an in-season price of $0.65; however, the offers were not accepted by the fishers. Wards Cove made the same offer on July 2, and their fishers indicated that they would discuss the offer in a meeting.

The in-season price eventually settled at $0.70 for the defendant processors, ending the strike.[10] Nelbro offered $0.70 on July 2, which was also initially refused, but was accepted the next day. Wards Cove also offered $0.70 on July 3, based on inaccurate information that Peter Pan posted $0.70. The fishers accepted the Wards Cove offer on or about July 3.

NPPI also settled with its fishers at $0.70 after withdrawing a higher offer. NPPI offered its fishers $0.75 on July 3 through a fisher intermediary. However, this deal was conditioned on a promise that the offer would not be released to the media. Before Nelbro's fishers had accepted Nelbro's $0.70 offer, Nelbro learned about NPPI's $0.75 offer, as well as a rumored $0.75 offer by another nonparty processor. However, the Nelbro representative called NPPI and the other processor to confirm the price, and both processors denied it. NPPI's $0.75 offer was leaked to the media, and even though the fishers tried to accept the offer, NPPI rescinded it later on July 3. The NPPI fishers then accepted a $0.70 offer from NPPI, apparently also on July 3.

### d. *Discussion of future in-season prices*

The plaintiffs also claim that there is evidence that the processors discussed future prices for in-season prices that had not yet been set.

---

8. This processor representative stated that these topics included "what were sockeye selling for now, what was the market doing" and "[t]he market for sockeye in Japan."

9. Defendants prefer to characterize these events as a "boycott," in which "the fishers demonstrated their considerable economic power."

10. Ocean Beauty matched this price retroactively. The parties do not point to anything in the record that shows what price Unisea paid to settle the strike in 1991.

First, the record contains evidence of some discussion among the importer defendants that may concern a drive to lower in-season prices for the 1989 season. At the start of the 1989 season, four of the defendant processors (Nelbro, NPPI, Peter Pan, and Trident) posted prices of $1.25, while the three others (Icicle, Ocean Beauty, and Wards Cove) had open tickets. On June 10 Icicle posted a price of $1.00. Later, the processors who posted $1.25 prices all adjusted their in-season prices downward, non-retroactively, to $1.00 on June 24 (Peter Pan and Trident) and 25 (Nelbro and NPPI). On June 25 Wards Cove matched the $1.00 price by announcing its first in-season price of $1.00, while on June 26 Ocean Beauty joined the downward trend by adjusting to $1.10.

There is evidence that suggests that there was some discussion of the 1989 prices in advance of these events. Employees of Nelbro predicted, based on prices established in other fisheries with earlier seasons, that the price in Bristol Bay would be $1.25. Some importer employees reported a "desire" or "intention" on the part of the processors to bring prices down from the initial $1.25 level; one Nissui employee stated in a memorandum written on June 20: "There is a desire to start under $1.00. There is also an intention to bring the current price of $1.25 down later after seeing how the fishing is going." Another Nissui document stated that the major processors "show signs that their [in-season] prices will start at $1.00/lb." In addition, on May 18 and June 22 there may have been some conversations between Nelbro, Peter Pan, and Marubeni employees about conditions for the run and possible pricing ranges.

For the 1990 season, the defendant processors all posted in-season prices of $1.00, with the exception of Ocean Beauty, which posted a price of $1.30. Three of the processors (Nelbro, Trident, and Wards Cove) all posted on the same day, July 1, while Peter Pan posted the next day.

There may have been discussions of this $1.00 price in advance of July 1. The record contains telexes from the nonparty importer Mitsui which document individual meetings that occurred on June 26, 1990, between Mitsui and Wards Cove, and Icicle, where in-season prices may have been discussed. A document that may or may not refer to that meeting notes that "Bristol Ground Price dropping down to 1.00" from one or more of the processors.[11] Also, handwritten notes indicate that a Nelbro representative discussed possible in-season prices with representatives from Marubeni (on May 23) and a nonparty importer (on June 6). One or both participants may have predicted prices of $0.75–$1.00 or $0.80–$1.00.[12] After talking to another Nelbro employee, the Nelbro representative wrote, on June 29, that "a major advance at 1.00 is most likely." On July 1, the day that the in-season prices were set by Nelbro, Trident, and Wards Cove, the $1.00 figure for Nelbro and Trident was apparently known a few hours or minutes in advance by representatives of Nelbro and Unisea.[13]

Also, further discussions about this $1.00 price continued after July 1. Nelbro employees discussing the matter with each other noted that the $1.00 price was holding: "F.P. still posted at 1.00 ... P.Pan." An internal importer telex from Mitsui stated that "fishermen's price for major packers are fixed at USD1.00 until further notice."

There is also evidence in the record concerning discussions of prices in advance of the 1992 season. All of the processors apparently started the season with open tick-

---

11. The document is dated June 26, with no year, and in a deposition a Mitsui employee was unable to provide the year.

12. The notes from the May 23 meeting state, under the headings "Bene" [Marubeni] and "B.Bay": "Last Yr F.P. 1–1.25 ... 75¢—Likely 1.00."

The notes from the June 6 meeting state, under the heading "Taiyo" [employee of nonparty importer]: "B.Bay fish price maybe 80–90–1.00."

13. A representative of a nonparty processor testified that on July 1, 1990: "[A Nelbro representative] mentioned that he had confirmed with Trident that they were paying $1.00. They were going to pay between $1.00 and $1.50." July 1, 1990 notes from a Unisea representative contain the notation: "Advised Trident & Nelbro will announce a 1.00 advance price today."

ets,[14] although there is conflicting evidence as to Peter Pan's actions. Between June 15 and July 7 processors offered in-season prices of $1.00–$1.05. Some written notes of a June 17, 1992 conversation between Nelbro and Peter Pan employees contain a statement that may concern discussion of the 1992 in-season prices: "Bay—advance 1.00; close 22nd."

### e. *Joint agreement to keep prices low in other fisheries*

The record also contains evidence of discussions between processors and importers of prices in fisheries other than Bristol Bay.

The False Pass salmon run was considered by the processors to be a benchmark for Bristol Bay because the salmon run in False Pass occurs earlier than the Bristol Bay run and because many fish caught there were fish actually en route to the Bristol Bay salmon run. One nonparty importer's telex—from an unknown year—includes the statement:

[T]here is a rumor that two major companies, Peter Pan and Trident, are engaged in ... laying the groundwork so as to suppress the fish price to a maximum of $1.00–0.70 in False Pass.... [A] high fish price could very well be considered a suicidal act for the processors themselves. Therefore, we are speculating here that there won't be anything odd about major processors actually taking action to keep the fish price as low as possible in order to prevent them from going down all together.

In a memorandum between representatives of Peter Pan and Nichiro, Peter Pan's corporate parent, the Peter Pan representative complained about the actions of an importer and processor in False Pass. The memo states: "It has come to my attention ... that [Shin Nishoku, a nonparty importer] is going to show [Peter Pan and Trident] how to buy Red Salmon in False Pass. One company that we know of who will be selling to him is New West Fisheries.... [C]ould you please be kind enough to check this out at your end because as you know high prices again in False Pass will not help False Pass or Bristol Bay."

In 1992 in False Pass, some processors were apparently concerned over Mitsui's plan to have a "cost plus" contract with a nonparty processor, Yard Arm Knot (YAK). One nonparty processor stated the concern to Mitsui that this contract might raise prices. However, Mitsui's contract contained "price conditions" that contained a ceiling linked to pricing by Peter Pan and Trident; otherwise the contract was in fact a "cost plus" contract.[15] Other processors may also have complained.

There is also evidence of some discussion of prices in the Kodiak fishery in 1991. As reported by a Mitsui telex, a Wards Cove representative complained to Mitsui of high prices paid by Ocean Beauty in Kodiak ($0.92–$0.95): "[Ocean Beauty] started paying this price and W.Cove followed. [Wards Cove] is wondering who are buyers of [Ocean Beauty's] sockeye."[16] Nicherei, a defendant importer who bought from Ocean Beauty, apparently met with Ocean Beauty in an attempt to lower the price. Wards Cove later announced its lowered price in Kodiak as $0.80. This $0.80 may have been common in Kodiak, since a Mitsui document noted that "we heard that [Kodiak] fish price falling down to ... 0.80." A Mitsui employee claimed that this $0.80 price required a lowered $0.50 price in Bristol Bay.

---

14. The parties do not point to anything in the record that shows what prices Unisea paid during the 1992 season.

15. The first document supporting this, a Mitsui telex, states: "Stop our price conditions is Trident/P.Pan price plus USC90 or 58.5/LB to be covered everything."

The second document, apparently another Mitsui telex, states: "We plan to buy at the market price, which is the P.Pan/Trident price plus. As you already know, we are not having Chaggee purchase fish at just any price."

16. The Wards Cove representative explained in a deposition that the high price "bothered [him] ... [because he] was getting market price information that didn't appear to [him] to justify that kind of grounds price." When asked if it bothered him because it showed that prices in Bristol Bay would be high, the representative stated, "I don't know if that was my concern."

### 2. Strong-arm tactics employed against minor processors

The second category of evidence concerns alleged efforts by importers and processors to force smaller processors to offer lower prices to their fishers.

### a. Pressure applied on nonparty processor Woodbine

Woodbine Alaska Fish Co. (Woodbine), which was at one time but is no longer a defendant, is a small processor that offered higher prices to aggressively attract fishers from the other processors. For the 1990 and 1991 seasons, Mitsui was a major buyer of Woodbine's processed salmon. In 1990 Mitsui was the principal buyer; in 1991 it bought about fifty percent of Woodbine's salmon. Woodbine and Mitsui had a "cost plus" contract for some quantity of salmon processed on Woodbine's floating processor.

Mitsui and Woodbine representatives had conversations in 1990 and 1991 in which Mitsui told Woodbine that Woodbine's in-season prices were too high and that other processors were paying lower in-season prices.[17] Mitsui told Woodbine that other processors had complained to Mitsui about Woodbine's high prices—in particular, Trident and Wards Cove.[18] Also, there is evidence that Icicle and Nelbro representatives were concerned.[19] Mitsui also threatened Woodbine with ending their business relationship because of the high in-season prices.[20] The Mitsui representative claimed that Mitsui might be forced to stop doing business with Woodbine because other processors had threatened to stop selling to Mitsui.[21]

In response to this pressure, Woodbine did lower its in-season prices during the 1990 and 1991 seasons because of concern that Mitsui could withdraw funding assistance "or discontinue purchasing [Woodbine's] products." [22] In 1991 and 1992 its prices—re-

17. A Woodbine representative testified:
Q: What sort of things did the Mitsui employees tell you ... ?
A: Primarily that we were paying too much. That the other companies weren't paying as high.

18. A Woodbine representative testified:
Q: So you would have heard ... statements about the complaints from the other processors, several times a week during the 1990 Bristol Bay salmon season?
A: Right....
 ....
Q: [D]id the Mitsui employees ever identify particular other processors who were making these complaints?
A: Um, the only one that was usually specifically mentioned was Sam Yoshida from Wards Cove....
 ....
Q: ... [In 1991], did any of those Mitsui employees identify particular other companies that had complained to Mitsui about Woodbine's high grounds prices ... ?
A: ... there was a reference at one point to Trident and crab; in other words, that they wanted to buy crab from Trident, but [Trident] may not sell them to Mitsui because [Mitsui was] buying salmon from Woodbine.
In addition, a March 9, 1991 Mitsui telex paraphrased a Trident representative as saying: "[The Trident representative] is very critical [of] Japanese buyers who back up small size operators like [Woodbine]. Those operators always raise fishermen price and cause a big problem to major operators. He knows we buy fish from [Woodbine]."

19. An internal Mitsui telex indicates that Mitsui met separately with Wards Cove, Nelbro, and Icicle representatives to discuss the situation on June 26, 1990. The processor representatives expressed concern, and Mitsui stated: "[E]verybody now knows our business with Woodbine naturally.... I think [Woodbine] will take just reasonable attitude against fish purchase. And will not be so strong to lead price."

20. The Woodbine representative testified that the Mitsui representative told her: "The price was too high. We can do business with Wards Cove. We don't have to do business with Woodbine."

21. The Woodbine representative testified:
Q: What was the nature of the threats that were made to you by [Mitsui]?
A: [Mitsui] had told us that, if we didn't start lowering our price, that some of the other [processors] were not going to continue selling products to them.
Q: How many times did [Mitsui] make that particular threat in [its] discussions with you?
A: Well ... the threat may not have been worded in that exact way, but [Mitsui] would make reference to them not being able to buy product from other companies and that they didn't know if they could continue buying from us.

22. At one point in the 1990 season, Woodbine was paying $1.35, which Mitsui told Woodbine was unacceptable, citing their "cost plus" contract. In response, Woodbine lowered the price to $1.25.

spectively, $0.70 and $1.00—matched those of the defendant processors.

However, after 1992 Mitsui ceased to be a significant buyer of Woodbine's salmon. After the 1992 season Mitsui refused to commit to preseason contracts and bought salmon from Woodbine in only "relatively minor" spot sales. A Woodbine representative implied that she believed that Mitsui took these actions because Mitsui shifted much of its buying to Wards Cove and that Mitsui responded to pressure applied by Wards Cove.[23]

### b. *Pressure applied on nonparty processor Baypack*

Baypack is a small processor that began operations in Bristol Bay in 1995. Baypack had a contract with Nelbro to market Baypack's salmon output. However, just before Baypack's floating processor vessel arrived in Bristol Bay, a Nelbro representative began to state concerns about Baypack's high in-season prices. The Nelbro representative claimed that there was an "uprising" among Nelbro fishers when the fishers found out that Baypack fishers might get more money than Nelbro fishers.[24] The Nelbro representative also stated that Baypack's higher prices would "damage" Nelbro's "neighbors"—Ocean Beauty, Trident, and Unisea—by "taking away their fishermen." The Nelbro representative told Baypack that a Trident representative had said that "he was going to bury [Baypack]." The Nelbro representative later stated to the Baypack representative: "What the hell are you doing screwing up the industry by paying $1.10 a pound in Ugashik?"

Also, a Baypack representative testified that more than halfway through the season he had "an enraged one-sided discussion" with a Nelbro representative in which the Nelbro representative "accused [Baypack] of screwing up the industry by paying an outrageous cash price." However, despite this pressure, there is no evidence in the record that Baypack responded by lowering its prices.

### c. *Pressure applied on nonparty importer Shin Nishoku and a nonparty processor*

A Peter Pan memorandum indicates that Peter Pan was concerned about the high prices paid by nonparty importer Shin Nishoku and a nonparty processor during the 1990 season. The processor was using a steamer supplied by Nichiro for these operations. The memorandum indicates that a Peter Pan representative contacted Nichiro and "expressed in the strongest possible terms that that relationship is total contrary to the good of Peter Pan and must be broken off or the result of [the nonparty processor] paying very high raw fish prices could have tremendous financial impact on Peter Pan." The Peter Pan representative testified that Nichiro terminated its services to the small processor under pressure from Peter Pan; however, the Peter Pan representative claimed that the services were terminated because they were "illegal." Later the processor "went broke."

### 3. *Importer management, organization, and coordination of processor efforts to lower prices*

The third category of evidence concerns the importers' alleged efforts to manage the allegedly conspiratorial activities of the processors.

### a. *The "Okaya Action Plan" for 1991*

In December 1990 there were meetings between (1) Wards Cove and Okaya representatives (December 4), and (2) Nelbro,

---

A May 1991 Mitsui telex states that Mitsui was willing to buy salmon from Woodbine only if their in-season price was to be between $0.50–$0.60. A June 1991 telex declares that "we believe that [the in-season price] should be as low as USC50 in order to protect packer's profit."

**23.** The Woodbine representative testified: "It was my opinion that, after the repeated warnings by Mitsui ... especially in referring to Wards

Cove, and they also told us that [Mitsui] had shifted [its buying] to Wards Cove in 1991, that they were no longer going to do business with us because of that."

**24.** However, the Baypack representative claimed that he hired a private investigator who contacted Nelbro fishers and found no evidence of any "uprising."

Okaya, and Nichirei representatives (December 6) in which the processors were presented with documents that the plaintiffs refer to as the "Okaya Action Plan." The document presented to Wards Cove stated:

> When it comes to '91 Frozen Market Overview, we feel going will get even tougher.... In a nut shell our market could be "completely a buyer's market".... The only possible way to overcome such difficulty and wipe out the "buyer's market" scar[e] would be the mutual cooperation among the packers and the importers in the following points: (a) Fish price reduction. In the extreme Bristol Bay Sockeye price may have to be reduced down drastically."

The same language is contained in the document presented to Nelbro. In the Wards Cove document, Okaya also stated:

> Request for '91[:]
>
> We would like to request you to keep ground price as much as lower level for [coming] season, and this eventually keeps reasonable FOB price to sell in the Japanese market.... We are assure[d] that Wards Cove Packing as a leader of this industry can establish reasonable FOB prices by enforcing to control the ground prices.

The Wards Cove representative testified that he remembered reading these comments at the December meeting. The Wards Cove representative claimed that he said at that meeting that what Okaya was asking "just wasn't possible from a practical standpoint, [because] we have no control over grounds prices in Bristol Bay"; and that "besides that, it was illegal."[25] Also, the Okaya employee who drafted the "Action Plan" stated that the phrase "mutual cooperation" did not mean cooperation to engage in price-fixing:

> Q: Is there anything wrong, in your view, with packers and importers engaging in mutual cooperation to reduce grounds prices or beach prices?

> A: ... one thing I can say for sure—and I must say for sure—is that I have no such intention.

And, the Okaya employee testified that the Okaya representatives told the Wards Cove representatives to "ignore" the whole section of the "Action Plan" under the heading "Request for '91."

The document presented to Nelbro was slightly different, but it also contains the first paragraph mentioned above from the Wards Cove document. The Nelbro document also suggests that Nelbro should follow pricing set by Wards Cove:

> @91 Okaya's Proposal
>
> ....
>
> (B) PRICING; ... (1) Basic Price: FOB Prices agreed between Wards Cove Packing and their traditional biggest buyer (Marubeni) for the same grades/quality Bristol Bay Sockeye produced and shipped in the same manner as NELBRO at the same time of the season.
>
> ....
>
> Historically speaking [Wards Cove's] prices used to be considered as the leading market price for the Bristol Bay Sockeye.... So we believe [Wards Cove's] prices can be very useful for our reasonable pricing for the Japanese buyers every season.... [W]e don't believe [that Trident and Icicle] have the fair reputation in the Japanese market for the reasonable pricing in most cases.

### b. Mitsui's 1991 "campaign" to lower in-season prices

There is some evidence that, in advance of the 1991 season, Mitsui representatives contacted some processors to express the opinion that in-season prices should be about $0.50. Mitsui apparently had the intention in February 1991 to visit processors, including at least all of the defendants except Nelbro

---

**25.** However, on another occasion the Wards Cove representative claimed not to remember any discussion of the relevant text in the "Action Plan." Also, an Okaya employee who was apparently at the meeting claimed that he had no memory of the Wards Cove representative's alleged statements about the illegality of price-fixing; however, the Okaya employee did remember that the Wards Cove representative "said something like it is impossible for Wards Cove to control beach prices." Another Wards Cove employee testified that the first representative said at the meeting that "we can't get involved in pricing; setting fish prices."

and Ocean Beauty, to find out "what ground price they are expecting." Mitsui representatives actually did visit Icicle, Wards Cove, Trident, NPPI, Woodbine, and YAK. As for the meeting with Trident, a February 12, 1991 internal Mitsui telex notes that during this visit Trident representatives "agreed" with Mitsui's "opinion" for a $0.50 price. In a visit with nonparty processor Lafayette, that processor "agree[d] prices should go down, but how far is question." Mitsui employees may have expressed Mitsui's opinion that in-season prices should be about $0.50 to Wards Cove and nonparty processor Woodbine.[26] This opinion was also expressed in an internal document.[27]

At the same time, other importers also may have been expressing "opinions" as to what the 1991 in-season price should be. A Nelbro employee had a conversation with an unknown person in which that person told him: "Japan will ask for 10–20% price reduction, then negotiate + compromise [with fishers]." An internal telex of a nonparty importer stated: "A lot of people here in Japan think that the fish price should be $.50–.70, and most people believe that if it isn't at that price, they won't be able to expand the sales."

c. *1992 meetings organized by importers*

In advance of the 1992 season, importers again organized meetings with processors in which the importers apparently advocated lower in-season prices. Okaya and Nelbro representatives met in December 1991 and the Nelbro representative's written notes

stated: "91 we had low fish price. It would be bad to show strong interest during fishing season 92 affect fish price. [They] wanted answer now: Said no not now." During the season, an Okaya report dated June 18, 1992 stated that "[a] beach price of $1.00 is what we desire, but if not, we want the beach price to be held to a maximum of $1.25. (In the worst case, it may be up to $1.30.)" The report noted that "[t]he price does not get established by Nelbro singularly, nor does it get dictated by the one-sided opinion of YAK/Dragnet. Please do not forget the fact that the PRICE LEADER of Alaska ... is [*Nelbro* ] *v. Marubeni.*"[28]

There may have also been meetings between (1) Nichiro and Icicle, (2) Nichiro and Trident, and (3) Nichiro, Marubeni, and NPPI sometime in 1992 in which Nichiro representatives advocated or predicted an in-season price of $1.00.[29]

Mitsui also apparently attempted to make its opinions on the 1992 in-season prices known. An internal Mitsui telex stated "[w]e better give guidance to U.S. packers [on prices] as Japanese voices," and another telex asked, from one Mitsui employee to another, "would you pls give us how market people are thinking about new price level of Alaskan reds in this coming season so that we can give such feeling to Wards Cove/YAK/others as initial input." A May 1992 Mitsui report, which was "used somehow in explaining situations to packers," stated that "we believe that packers can sell with fishing ground price at USD1.00/LB." This report was sent to Wards Cove in June. A Mitsui employee

---

**26.** This April 20, 1991 telex states that Wards Cove representatives stated that there was "no need to cut fishermen price as low as USC 50–60–70." The document implies that lower prices were needed and that this was explained to Wards Cove: "We explained to [Wards Cove] what you want to explain against such packers' [action]."

**27.** This June 10, 1991 telex states: "We believe that fishermen's price for Bristol Red should be as low as USC50 in order to protect packer's profit."

**28.** The report also stated prices that were "[t]he Japan side's desired price," which presumably referred to the prices to be paid by Okaya to processors.

**29.** The plaintiffs claim that other meetings may be inferred between Nichiro and other importers and processors from a document from a Nichiro employee detailing that employee's work responsibilities. However, this document is dated March 1990. Another similar document dated April 1992 seems to indicate that a Peter Pan employee did have regular contacts with processors and importers: "Just before a salmon ... season began, I wanted to find out about the movements of [illegible] in particular and other companies (especially FOB prices). To this end, I contacted industry people on the attached list." A Nichiro employee's contact list included representatives of Icicle, Trident, Wards Cove, Nippon Suisan, and NPPI.

apparently knew as of June 5, 1992 that "acc[ording] to packers in [Seattle], they can pay USD1.00/LB to fishermen for Bristol red salmon . . . ."

### d. *Trade journal editorials*

A June 10, 1989 article in a Japanese trade publication, *Nikkan Hokkai Keizai*, entitled "Avoid Excessive Competition," seems to advocate price-fixing by the processors and importers operating in Bristol Bay. The article states: "This year, it is about time when the distribution industry as a whole, including 'catchers,' review the prices of salmon . . . . Under these circumstances, some are seriously advocating that, rather than engaging in a useless purchase quantity contest, it is time to discern what the right prices should be in light of excessive supply quantities in the market." There is evidence that importers read articles like this one and passed them on to processors.

### D. *Proceedings Below*

A group of plaintiffs commenced this action in June 1995, and a plaintiff class was certified on January 2, 1997.

During the discovery period, on September 21, 1998, the superior court limited discovery so as to exclude the plaintiffs' claims of "alter ego" with respect to certain defendants because those claims were not pled in the plaintiffs' fourth amended complaint. The plaintiffs appeal this ruling.

On April 28, 1999, the superior court held that the statute of limitations, AS 45.50.588, did not apply to limit plaintiffs' damages to those suffered for four years before the filing of the complaint. All of the defendants have joined a cross-appeal on this issue, opposed by both the plaintiffs and amici curiae states including Alaska, Hawaii, Minnesota, Nevada, New Mexico, and West Virginia.

After the plaintiffs settled with some defendants, the superior court granted summary judgment as to all other processor and importer defendants. The defendants moved for costs and attorney's fees, but the superior court denied that motion. The superior court issued a final judgment on December 1, 1999. The plaintiffs appeal the grant of summary judgment, while the defendants cross-appeal the denial of the motion for attorney's fees and costs.

Some defendants also moved for summary judgment on the theory that the plaintiffs had presented no evidence of provable damages.[30] This motion was not ruled on by the superior court.

### III. *STANDARD OF REVIEW*

The standard of review for an appeal from summary judgment is de novo.[31] We will affirm a grant of summary judgment if there are no genuine issues of material fact and if the movant is entitled to judgment as a matter of law.[32] When making this determination, we draw all reasonable inferences in favor of the non-movant.[33] If in reviewing a summary judgment we must answer questions of law, we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[34] Moreover, we may affirm a grant of summary judgment on grounds other than those advanced by the lower court or parties.[35] The movant bears the initial burden of proving through admissible evidence (1) the absence of genuine fact dis-

---

**30.** The defendants suggest that we could affirm summary judgment on the basis that plaintiffs have failed to show provable damages. The defendant importers, in particular, ask us to consider their entire motion to dismiss for failure to show damages filed below, and they also include in their brief an abbreviated version of the argument they made below. The importers claim that the plaintiffs' expert's theory of damages is flawed because it assumes that the fishers' profits should be a constant fifty-six percent share of the wholesale price, which is implausible because fishers only received such a share between 1986 and 1988, and not before or after. The importers cite their own expert testimony in opposition

to the plaintiff's theory. This is a factual dispute that is best left to the superior court to resolve, and will not be addressed by this opinion.

**31.** *See Moore v. Allstate Ins. Co.,* 995 P.2d 231, 233 (Alaska 2000).

**32.** *See id.*

**33.** *See id.*

**34.** *See id.*

**35.** *See id.*

putes, and (2) its entitlement to judgment as a matter of law.[36] Once the movant has established a prima facie case, the non-movant, in order to prevent entry of summary judgment, is required "to set forth specific facts showing that [it] could produce admissible evidence reasonably tending to dispute or contradict the movant's evidence, and thus demonstrate that a material issue of fact exists." [37]

In the course of reviewing the grant of summary judgment, we must review evidentiary decisions made by the superior court; these decisions are reviewed for abuse of discretion.[38]

We must also consider the issue of whether a claim was properly pled under Alaska Civil Rule 8(a). Because we are "in virtually the same position as the trial court in its ability to assess the adequacy of the pleadings," this issue is reviewed de novo.[39]

Finally, we must interpret AS 45.50.588, the statute of limitations for antitrust actions. This is a question of law that we will review de novo.[40]

## IV. DISCUSSION

### A. Summary Judgment Principles in the Antitrust Context

#### 1. Alaska Statute 45.50.562

Alaska Statute 45.50.562 is the basis for the plaintiffs' claims in this case. It states that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is unlawful."

We have noted that claims brought under AS 45.50.562 are analogous to claims brought under § 1 of the federal Sherman Act,[41] and that federal cases construing § 1 of the Sherman Act will be used as a guide.[42] Antitrust claims under AS 45.50.562 are either "per se" claims or "rule of reason" claims.[43] Per se claims concern alleged behavior that, if proven, is clearly an illegal restraint on trade; other types of alleged conduct are subject to the rule of reason standard in which the factfinder must determine whether the restraint is unreasonable.[44] To establish a prima facie case under AS 45.50.562, the plaintiff must prove three elements: "(1) an agreement or conspiracy involving two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain competition; and (3) which actually injures competition." [45]

The plaintiffs' allegations here are per se allegations because they are allegations of a conspiracy to fix prices.[46] As we have noted, the usual price-fixing situation is one in which *sellers* conspire to fix prices; however, *purchasers* such as the processors and importers in this appeal, when "acting in concert to affect prices," may violate AS 45.50.562.[47]

We have also noted, when reviewing summary judgment in cases of this kind, that the particular factual circumstances are critically important: "Sherman Act cases of this kind generally must be determined on the

36. See Philbin v. Matanuska–Susitna Borough, 991 P.2d 1263, 1265 (Alaska 1999).

37. Id. at 1265–66 (quotations omitted).

38. See Smithart v. State, 988 P.2d 583, 586 (Alaska 1999).

39. Gamble v. Northstore Partnership, 907 P.2d 477, 482 (Alaska 1995).

40. See Gossman v. Greatland Directional Drilling, Inc., 973 P.2d 93, 95 (Alaska 1999).

41. See 15 U.S.C. § 1 (2000).

42. See Odom v. Lee, 999 P.2d 755, 761 (Alaska 2000).

43. See id. at 762; Betz v. Chena Hot Springs Group, 742 P.2d 1346, 1349 (Alaska 1987).

44. See Odom, 999 P.2d at 762.

45. See id. at 762 (quoting Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1445 (9th Cir. 1988)).

46. See Betz, 742 P.2d at 1349.

47. KOS ex rel. Sourdough Freight Lines, Inc. v. Alyeska Pipeline Serv. Co., 676 P.2d 1069, 1072 (Alaska 1983).

facts of each case."[48] Summary judgment "should be used sparingly in antitrust litigation," and "[w]hen an antitrust plaintiff has established a prima facie case, he should have an opportunity to prove the necessary supporting facts at trial."[49]

### 2. *Alaska summary judgment principles*

We will affirm summary judgment if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law.[50] The non-movant "need not establish that he will ultimately prevail at trial." That is, the non-movant is *not* required to submit evidence that tends to show that the non-movant could prove its case by satisfying the relevant burden of proof at trial.[51]

In making this determination, all reasonable inferences are made in favor of the non-movant.[52] Reasonable inferences are those inferences that a reasonable fact-finder could draw from the plaintiff's evidence.[53] However, the plaintiff must present more than a "scintilla" of evidence to avoid summary judgment; the plaintiff must present enough evidence to "reasonably tend[ ] to

dispute or contradict" the evidence presented by the defendant.[54]

We have indicated that we will not engage in a weighing of the evidence on summary judgment; there is a "genuine issue" of material fact as long as the non-movant has presented *some* evidence in support of its legal theory. In *Moffatt v. Brown,* we rejected a summary judgment standard for defamation used by federal courts because it incorporated a substantive evidentiary standard into the summary judgment analysis, "inevitably implicat[ing] a weighing of the evidence."[55] In *Meyer v. State, Department of Revenue, Child Support Enforcement Division ex rel. N.G.T.,* we held that a putative father's sworn denial of paternity was enough to prevent summary judgment, even in the face of strong scientific evidence showing his paternity, because *"any* evidence sufficient to raise a genuine issue of material fact precludes a summary finding of paternity."[56] As we reaffirmed, we "do[ ] not weigh the evidence or witness credibility on summary judgment."[57]

### 3. *Federal antitrust decisions*

We use federal law as a guide when considering claims brought under AS

**48.** *Odom,* 999 P.2d at 762.

**49.** *Id.*

**50.** *See Moore v. Allstate Ins. Co.,* 995 P.2d 231, 233 (Alaska 2000).

**51.** *Gablick v. Wolfe,* 469 P.2d 391, 395 (Alaska 1970); *see also Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.,* 584 P.2d 15, 24 (Alaska 1978).

**52.** *See Totem,* 584 P.2d at 24.

**53.** *See Holland v. Union Oil Co.,* 993 P.2d 1026, 1031–32 (Alaska 1999) (inference of "just cause" employment relationship not reasonable from document because no reasonable juror could draw that inference); *Smith v. State,* 921 P.2d 632, 634–36 (Alaska 1996) (inference from evidence that State undertook duty of care was reasonable because jury could reasonably infer that State undertook duty); *Mulvihill v. Union Oil Co.,* 859 P.2d 1310, 1314 (Alaska 1993) (inference that defendant undertook duty of care was not reasonable because "reasonable people

could not differ on the nature and extent of this voluntarily undertaken duty").

**54.** *Yurioff v. American Honda Motor Co.,* 803 P.2d 386, 389 (Alaska 1990) (quoting *State, Dep't of Highways v. Green,* 586 P.2d 595, 606 n. 32 (Alaska 1978)); *see also French v. Jadon, Inc.,* 911 P.2d 20, 25–26 (Alaska 1996) (deposition testimony by non-movant is not enough to oppose summary judgment when that testimony is based on unsupported suppositions).

**55.** 751 P.2d 939, 944 (Alaska 1988) (quoting *Dairy Stores, Inc. v. Sentinel Publ'g Co.,* 104 N.J. 125, 516 A.2d 220, 236 (1986)). In *Moffatt,* we rejected a summary judgment standard in which "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.* at 942 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**56.** 994 P.2d 365, 367 (Alaska 1999) (quotations omitted).

**57.** *Id.*

45.50.562.[58] Federal courts have noted that the non-movant's evidence should not be "compartmentalized," but should be considered as a whole, to determine whether it gives rise to a reasonable inference of antitrust conspiracy.[59] The plaintiff's evidence of a conspiracy may either be direct or circumstantial. The difference is that "[d]irect evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."[60] That is, "with direct evidence the fact finder is not required to make inferences to establish facts."[61] Therefore, if the plaintiff presents only circumstantial evidence, the factfinder must make inferences from that evidence to find an antitrust conspiracy. A plaintiff is not required to present any direct evidence, but may support his case solely with circumstantial evidence.[62]

If the plaintiff relies on circumstantial evidence, the United States Supreme Court's decision in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*[63] becomes relevant. In *Matsushita*, the Court considered an alleged Sherman Act § 1 conspiracy in which television manufacturers, in order to reap monopoly profits later, conspired to engage in predatory pricing in the U.S. market by conspiring to keep prices low to force others out of the market.[64] The Court reviewed a grant of summary judgment in favor of the defendants. Noting that reasonable inferences are to be drawn in favor of the non-moving party, the Court stated that its earlier decision in *Monsanto Co. v. Spray–Rite Service Corp.*[65] limited "the range of permissible inferences from ambiguous evidence in a § 1 case":

> [C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. [The plaintiff], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff].[66]

In *Matsushita*, the Court went on to apply these principles to affirm summary judgment because the plaintiffs' evidence, viewed together, did not give rise to a reasonable inference of conspiracy: The cost-cutting behavior engaged in by the defendants was plausibly competitive behavior, and the defendants had no incentives to join in the alleged conspiracy.[67] The Court also noted that the predatory pricing conspiracy alleged by the plaintiffs was "economically senseless": The defendants allegedly conspired to "destroy companies larger and better established than themselves, a goal that remains far distant more than two decades after the conspiracy's birth."[68] The Court therefore implied that this "economic senselessness" provided another basis for its ruling that there was no genuine issue of a conspiracy for trial.[69]

**58.** *See Odom v. Lee*, 999 P.2d 755, 761 (Alaska 2000).

**59.** *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124 (3d Cir.1999); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir.1998); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir.1993).

**60.** *In re Baby Food Antitrust Litig.*, 166 F.3d at 118; *see also In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir.1999).

**61.** *In re Baby Food Antitrust Litig.*, 166 F.3d at 118 (quotation omitted).

**62.** *See Petruzzi's*, 998 F.2d at 1230.

**63.** 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**64.** *Id.* at 584, 106 S.Ct. 1348.

**65.** 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

**66.** *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348.

**67.** *See id.* at 595–97, 106 S.Ct. 1348.

**68.** *Id.* at 597–98, 106 S.Ct. 1348.

**69.** *See id.*

Federal courts have interpreted *Matsushita* to require a two-part test for summary judgment. Under this test, the court first determines if the plaintiff's evidence is "ambiguous"—that is, if the evidence is of conduct that is "as consistent with permissible competition as with illegal conspiracy."[70] If so, the plaintiff only avoids summary judgment if it submits some evidence that "tend[s] to exclude the possibility that the defendants acted independently."[71]

▪ As the plaintiffs point out, the *Matsushita* test is only relevant if the plaintiffs have not presented *direct* evidence of a conspiracy because the *Matsushita* analysis is concerned with the reasonableness of inferences drawn from circumstantial evidence. As the Third Circuit Court of Appeals noted, "if a plaintiff provide[s] direct evidence of a conspiracy, then the strictures of *Matsushita* d[o] not apply" because "no inferences are required from direct evidence to establish a fact and thus a court need not be concerned about the reasonableness of the inferences to be drawn from such evidence."[72]

▪ Moreover, when the plaintiffs' theory of conspiracy does rely entirely on circumstantial evidence, *Matsushita* requires that this evidence "be evaluated in its factual context" to see if the summary judgment record as a whole provides a specific factual basis that, if accepted as true, would " 'tend to exclude the possibility' that the alleged conspirators acted independently."[73] We do not read *Matsushita* to "give every judge hearing a motion for summary judgment in an antitrust case the job of determining if the evidence makes the inference of conspiracy more probable than not."[74] In this sense, the case is consistent with our decisions in *Meyer*[75] and *Moffatt*,[76] which preclude courts from weighing summary judgment evidence. The concern in *Matsushita* is not with the weight of competing evidence but with the existence of a rational basis for drawing contextually plausible inferences

---

**70.** *AD/SAT v. Associated Press*, 181 F.3d 216, 233 (2d Cir.1999) (quoting *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348); *see also Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir.1996); *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1171 (7th Cir.1990); *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 899 F.2d 474, 483 (6th Cir. 1990); *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1379 (10th Cir.1988).

**71.** *AD/SAT v. Associated Press*, 181 F.3d 216, 233 (2d Cir.1999) (quoting *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348); *see also Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir.1996); *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1171 (7th Cir.1990); *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 899 F.2d 474, 483 (6th Cir. 1990); *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1379 (10th Cir.1988).

The Court in *Matsushita* also based its decision on another analysis applied by some courts. The Court held that summary judgment was proper in part because the alleged conspiracy was "economically senseless." *Matsushita*, 475 U.S. at 596–98, 106 S.Ct. 1348. Specifically, the predatory pricing scheme alleged was one that "makes no practical sense" because the goal of the conspiracy was impossible and the conspirators had no "rational motive" to engage in the conspiracy. *See id.*

Other federal decisions applying this analysis indicate that summary judgment should be granted if the alleged conspiracy makes no economic sense because the conspirators did not stand to gain anything from the conspiracy or otherwise lacked a rational motive to conspire. These decisions indicate that summary judgment is rarely granted on this basis. *See Bridges v. MacLean–Stevens Studios, Inc.*, 201 F.3d 6, 14 (1st Cir. 2000) (affirming summary judgment because an alleged conspiracy was "illogical"; plaintiffs presented no evidence showing that the conspirators had a motive to conspire); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 474–75 (3d Cir.1998) (refusing to affirm summary judgment on the basis of economic senselessness); *Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032, 1036 (6th Cir.1996) (same); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1232 (3d Cir.1993) (same); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir.1987) (same).

**72.** *Petruzzi's*, 998 F.2d at 1233; *see also Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 858 (10th Cir. 1999); *Rossi*, 156 F.3d 452 at 466; *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1001 (3d Cir.1994); *Petroleum Prods.*, 906 F.2d at 441.

**73.** 475 U.S. at 587–88, 106 S.Ct. 1348 (internal citation omitted).

**74.** 475 U.S. at 601, 106 S.Ct. 1348 (White, J., dissenting).

**75.** 994 P.2d 365, 367 (Alaska 1999) ("The court does not weigh the evidence or witness credibility on summary judgment.").

**76.** 751 P.2d 939, 944 (Alaska 1988).

from circumstantial evidence that in theory could go either way. The case does not permit summary judgment to be granted if the record as a whole, realistically viewed, would allow a reasonable juror to draw rational inferences in favor of each party depending on the juror's view of disputed factual evidence rather than abstract economic theory.

Furthermore, when the plaintiff's theory is specifically based on "conscious parallelism," there is an established procedure for determining whether the evidence tends to exclude the possibility of independent action. A "conscious parallelism" theory is one in which the plaintiff claims that the defendants engaged in "consciously parallel" conspiratorial behavior, such as a group of defendant buyers who engaged in setting parallel prices.[77] As many courts have recognized, a plaintiff may not rely entirely on evidence of consciously parallel behavior: "[P]arallel conduct alone will not suffice as evidence of . . . a conspiracy, even if the defendants knew the other defendant companies were doing likewise."[78] If the plaintiff's theory is based on conscious parallelism, the plaintiff must present evidence of one or more "plus factors."[79] As the defendants acknowledged at oral argument,[80] these plus factors supply the required evidence that

tends to exclude the possibility of independent action, preventing the imposition of summary judgment for the defendants.[81]

The required plus factors may include evidence of: (a) actions contrary to the defendants' economic interest;[82] (b) motive to enter the conspiracy;[83] (c) a traditional conspiracy agreement;[84] (d) interdefendant conspiratorial communications;[85] or (e) attempts to control or influence the behavior of other nondefendant sellers or buyers who could thwart the conspiracy.[86] Once the plaintiff has submitted evidence of "plus factors," the plaintiff will have demonstrated that there is a material issue of fact, and summary judgment must be denied.

### B. Material Issues of Fact Require Reversal of Summary Judgment.

The defendants filed both individual and collective motions for summary judgment, and the superior court granted summary judgment on the two collective motions filed, respectively, by the importer defendants and the defendants in their entirety. Because there are material issues of fact as to whether a conspiracy to fix prices existed between 1989 and 1995, we reverse these rulings.

77. See Petruzzi's, 998 F.2d at 1232, 1242 (defendants were buyers of meat waste products from supermarkets who allegedly rigged and divided the market to depress prices); In re Beef Indus. Antitrust Litig., 907 F.2d 510, 513 (5th Cir.1990) (defendants were beef packers and processor buyers of cattle who allegedly depressed cattle prices through price-fixing).

78. Apex Oil, 822 F.2d at 253 (quotation omitted); see also Blomkest Fertilizer, 203 F.3d at 1032–33; In re Citric Acid Litig., 191 F.3d at 1102; City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 570–71 (11th Cir.1998); Mitchael, 179 F.3d at 859; Petruzzi's, 998 F.2d at 1232; In re Beef Indus. Antitrust Litig., 907 F.2d at 513–14; Petroleum Prods., 906 F.2d at 444–45; Market Force, 906 F.2d at 1172; Dunnivant v. Bi–State Auto Parts, 851 F.2d 1575, 1583 (11th Cir.1988).

79. See Apex Oil, 822 F.2d at 253.

80. Counsel for the defendants stated at oral argument that "[t]he plaintiff has some burden under federal law to come forward with . . . evidence . . . that tends to exclude the possibility of independent action." In response to the question,

"[i]s that like the plus factors?" counsel replied, "that's . . . exactly correct on that. It is the plus factors . . . ."

81. See Petruzzi's, 998 F.2d at 1232; In re Beef Indus. Antitrust Litig., 907 F.2d at 514; Petroleum Prods., 906 F.2d at 445.

82. See Blomkest Fertilizer, 203 F.3d at 1037; Harcros Chems., 158 F.3d at 572–73; Mitchael, 179 F.3d at 859; In re Baby Food Antitrust Litig., 166 F.3d 112, 122 (3d Cir.1999); Petruzzi's, 998 F.2d at 1242, 1245–46; Apex Oil, 822 F.2d at 254.

83. See In re Baby Food, 166 F.3d at 122; Petruzzi's, 998 F.2d at 1243, 1245–46; Apex Oil, 822 F.2d at 254.

84. See Petruzzi's, 998 F.2d at 1242, 1245–46.

85. See Blomkest Fertilizer, 203 F.3d at 1033–37; Petroleum Prods., 906 F.2d at 445–47, 452–55; Apex Oil, 822 F.2d at 254.

86. See Petroleum Prods., 906 F.2d at 455–60.

The only ruling that is before us is the superior court's ruling on the defendants' two collective motions for summary judgment. The superior court granted summary judgment for the processors because it held that there were no material issues of fact on the existence of an antitrust conspiracy joined by the processor defendants. As for the importers, the superior court similarly held that there were no material issues of fact as to whether the importers "collectively" joined an antitrust conspiracy.

Because the plaintiffs' evidence does create an issue of fact as to the existence of a price-fixing conspiracy involving some or all of the defendants, we reverse these rulings. However, our decision is limited to the existence of the conspiracy alone. We take no position as to whether some individual defendants may be entitled to summary judgment because there is no evidence connecting them to the conspiracy.[87]

The superior court held that the defendants met their burden of proof for summary judgment by denying their participation in any price-fixing conspiracy. As we have noted, the movant for summary judgment bears the initial burden of "establishing the absence of a genuine issue as to any material fact."[88] The plaintiffs do not contest the superior court's ruling that the defendants satisfied their initial burden through their denials.[89] Therefore, the burden shifts to the plaintiffs to show that there is a material issue of fact for trial.

As discussed above, our analysis of summary judgment in an antitrust price-fixing conspiracy case requires us to inquire initially whether the plaintiffs presented direct evidence of a price-fixing conspiracy; if not, we must further determine if the plaintiffs'

circumstantial evidence is supported by evidence tending to exclude the possibility of independent action. Because much of the plaintiffs' evidence in this case tends to exclude the possibility of independent action, we reverse the grant of summary judgment below.

1. *The plaintiffs have not presented direct evidence of a price-fixing conspiracy.*

The plaintiffs argue that four groups of evidence constitute direct evidence of conspiracy: (a) price verifications, (b) pressure applied on Woodbine and Baypack, (c) NPPI's actions during the 1991 strike, and (d) future price discussions. Each of these will be considered in turn.

a. *Price verifications*

■ As already discussed, the evidence of price verifications, at most, shows that in-season prices were verified, and that sometimes "general discussions" about pricing took place, including discussion of adjustments in preceding years, the quality of an upcoming salmon run, prices in other fisheries, and speculation about market conditions for the upcoming season. None of this constitutes direct evidence of conspiracy because in order to conclude that there was a conspiracy, the factfinder would need to infer that these discussions were part of or included agreements to fix prices.[90]

b. *Pressure applied to nonparty processors Woodbine and Baypack*

The superior court discussed the possibility that evidence concerning the pressure applied to Woodbine and Baypack might con-

---

87. Therefore, we do not address Ocean Beauty's arguments that it should individually be granted summary judgment because its prices were not parallel with those of the other defendant processors and because the plaintiffs' evidence does not tie Ocean Beauty to the alleged conspiracy. We leave these issues for the superior court to decide on remand.

88. *See Hikita v. Nichiro Gyogyo Kaisha, Ltd.,* 12 P.3d 1169, 1179 (Alaska 2000) (quoting *Howarth v. First Nat'l Bank of Anchorage,* 540 P.2d 486, 489 (Alaska 1975)).

89. *See Lowe v. Boggess,* 375 P.2d 199, 199–200 (Alaska 1962) (where plaintiff alleged unspecified cause of action based on "conspiratorial activities," defendant satisfied its burden on summary judgment by simply denying participation in any conspiratorial activities).

90. The statement by a nonparty processor that during the 1991 season it was attempting to "lower[ ] the fish price" by "check[ing] with" each processor is also not direct evidence of conspiracy because agreement by defendant processors must be inferred.

stitute direct evidence of conspiracy. The superior court held that this evidence is not direct evidence because several inferences are required to reach a conclusion that there is a conspiracy from this evidence.

■ The plaintiffs presented evidence tending to show that some processor defendants were concerned about Woodbine's high prices and that the defendants complained to Mitsui about it. However, the evidence is inconclusive as to whether these defendants complained individually or collectively, or whether they reached any agreement concerning Woodbine. As for Baypack, there is evidence that Nelbro complained to Baypack, and Nelbro apparently claimed that Baypack would "damage" other processors. But the plaintiffs have presented no direct evidence that Nelbro met with any other processors or came to any agreement with other processors concerning Baypack. No conclusion of conspiracy is possible without inferences that the processors coordinated their actions with other processors in the course of making complaints about Woodbine and Baypack.

#### c. *NPPI's actions during the 1991 strike*

As already discussed, during the 1991 strike NPPI offered its fishers a $0.75 price on the condition that the price be kept from the media. Nelbro and Peter Pan representatives somehow learned of the offer and contacted NPPI to confirm the price. NPPI subsequently rescinded the offer.

■ The evidence of NPPI's actions is not direct evidence of conspiracy because in order to reach a conclusion of conspiracy the factfinder would have to infer that Nelbro and Peter Pan's price verifications were part of a tacit agreement to fix or lower prices.

The plaintiffs also claim that a statement by an NPPI employee concerning the 1991 strike constitutes direct evidence of conspiracy. In a deposition, NPPI representative Robert Torres made the following statement concerning the in-season prices offered to fishers during the 1991 strike:

A: [I]nitially we offered our fishermen 60 cents. [Later,] [w]e offered 65 cents.

And then about July 2nd we offered 70 cents.

Q: And that's when they went fishing?

A: Well, that's when they all voted—it was not—I think, you know, it was like ... they were voting as a group and they all accepted I guess.

Q: I see. Were there other processors offering 70 cents at that time or—

A: No. I mean, well, I think 70 cents was offered about four days ... before that by another fish company. And they rejected it.

Q: Oh, they did?

A: Yes, I think Nelbro offered 70 cents, but—in Egegik about the 28th of June.

Q: Okay. Do you recall if any other processors were offering 70 cents by around the July 3rd period?

A: Everybody was.

Q: Everybody was?

A: Basically everybody. Well, they just agreed they'll pay 70 cents.

Q: The fishermen agreed?

A: (No audible response).

In another deposition, Torres was asked about his response to this last question, and he claimed that he nodded in response.

■ The Torres statement does not constitute direct evidence of conspiracy. On its face, the deposition testimony could be understood to mean that the processors "agreed" between themselves to pay $0.70. However, the statement is ambiguous because it could also be understood to mean that the processors each individually "agreed" with their fisher fleets to pay $0.70, especially when both deposition excerpts are read together. This is not direct evidence of conspiracy.

#### d. *Future price discussions*

The plaintiffs presented evidence of future price discussions in advance of the 1989, 1990, and 1992 seasons. In 1989 some processors started the season with in-season prices of $1.25 but eventually most processors settled at $1.00 on June 24 or June 25. Before the season, Nelbro employees

predicted the $1.25 price; some importer employees predicted it as well and stated that there was a general desire or intention among processors to bring that price down to $1.00.

 This evidence from the 1989 season is not direct evidence of conspiracy because the factfinder must infer that Nelbro's prediction was tied to an agreement or that the general "desire" or "intention" to lower prices was more than a unilateral attitude held by one or more processors individually.[91]

 In 1990 most of the processors posted an in-season price of $1.00. The plaintiffs' evidence shows that before the season a Nelbro representative separately discussed possible in-season prices with representatives from Marubeni and a nonparty importer. Notes from these meetings state simply: "Last Yr. F.P. 1–1.25 . . . 75c—Likely 1.00" and "B.Bay fish price maybe 80–90–1.00." After these meetings, a Nelbro representative wrote: "[A] major advance at 1.00 is most likely." This does not constitute direct evidence of conspiracy because the notes are ambiguous and the factfinder would have to infer agreement on price levels to find a conspiracy.[92]

 In 1992 most of the processors posted in-season prices of $1.00. Written notes from a June 17, 1992 meeting between Nelbro and Peter Pan state: "Bay—advance 1.00; close 22nd." This statement, like the others considered above, requires an inference to conclude that this was part of an agreement to fix pricing.

**2.** *Some of the plaintiffs' evidence tends to exclude the possibility of independent action.*

As discussed earlier, under the *Matsushita* analysis, the defendant is not entitled to summary judgment if the plaintiff presents evidence that tends to exclude the possibility of independent action. Where the plaintiff's theory is based on "conscious parallelism," the plaintiff may present evidence that tends to exclude the possibility of independent action by submitting evidence that constitutes "plus factors."[93] Therefore, a plaintiff in an antitrust price-fixing case may avoid summary judgment by presenting evidence that tends to show consciously parallel behavior in addition to plus factors.

**a.** *Conscious parallelism*

 Evidence of conscious parallelism is evidence: "(1) that the defendants' behavior was parallel [and] (2) that the defendants were conscious of each other's conduct and that this awareness was an element in their decision-making processes."[94]

The superior court held that the plaintiffs' evidence supported a reasonable inference of conscious parallelism because "the evidence shows that processors' conduct was parallel and interdependent." The superior court noted that the defendant processors conceded in the defendants' collective motion for summary judgment that prices were parallel. Some defendants also appear to make this concession on appeal.

**91.** The plaintiffs also presented the handwritten notes made by a Nelbro employee which appear to document meetings between Nelbro and Peter Pan on May 18, 1990, and Nelbro and Marubeni on June 22, 1990. These notes are mostly illegible, and they do not directly state that the participants reached any agreement as to pricing levels or any other issues. The notes from the May 18 meeting state: "Two-tier price," and the notes from the June 22 meeting read: "F[ish] P[rice] Bay . . . 1.00." Inferences are required to conclude from either of these cryptic remarks that the participants agreed on these prices or engaged in any other conspiratorial behavior.

**92.** Other evidence presented by the plaintiffs is also clearly not direct evidence of conspiracy. The record does not establish that any future

prices were discussed at separate meetings between Mitsui and Wards Cove, Nelbro, and Icicle, and a document allegedly tied to this meeting stating, "Bristol Ground Price dropping down to 1.00" has no year date. Also, the evidence that Nelbro and Unisea representatives had advance knowledge of Nelbro's and Trident's in-season pricing is· silent as to whether there was any agreement on pricing.

**93.** *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1232 (3d Cir. 1993); *In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir.1990); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 445 (9th Cir.1990).

**94.** *Petruzzi's*, 998 F.2d at 1243.

Even without a concession, conscious parallelism is established by the plaintiffs' evidence. Evidence in the record tends to show that, while not perfectly parallel, prices paid by the defendant processors between 1989 and 1995 were within a tight range and were often exactly parallel.[95] And the evidence of price verifications tends to show that the defendants were conscious of each other's conduct and that this awareness was an element in their decision-making processes. All eight processor defendants engaged in price verifications. There is also evidence that the defendant processors' knowledge of each other's prices was an element in their decision-making. As a Peter Pan representative explained:

Q: And why do you verify prices that another [processor] is paying fishermen in the Bay?

A: We get a lot of information and feedback from fishermen, and they all seem to have relatives or friends that fish for other companies. But sometimes the information you get from fishermen is not accurate.

Q: And why would you want to verify what a competitor is paying?

A: Well, we want to know that the—the information is accurate. We certainly would not want to react to information that was inaccurate.

Q: When you say you don't want to react to information that's inaccurate, do you want to react to what a competitor is paying?

A: If we want to keep and maintain a fishing fleet, we have to.

Other testimony also tends to show that processors used the price verifications in their decision-making. Together with the evidence of parallel prices, this evidence tends to establish conscious parallelism.

b. *Plus factors*

The plaintiffs presented several pieces of evidence that constitute plus factors. These will be discussed in turn.

i. *Torres statement concerning 1991 actions*

 As already discussed, the statement by NPPI employee Robert Torres concerning the 1991 strike can be read to state that the processors "agreed" between themselves to collectively offer an in-season price of $0.70 to settle the strike. Evidence of a traditional conspiracy agreement is a plus factor,[96] and the Torres statement qualifies as such because it supports a reasonable inference that some or all of the defendant processors agreed to fix prices for raw salmon.

ii. *Future price discussions*

Some of the plaintiffs' evidence concerning future price discussions tends to show that defendant processors communicated their intentions for future prices to other defendant processors or importers. In particular, in 1989 Nissui employees made statements tending to show that multiple processors made communications concerning future prices to them: "There is a desire to start under $1.00. There is also an intention to bring the current price of $1.25 down later after seeing how the fishing is going." An-

---

95. In 1989 in-season prices varied between processor defendants in a range of $1.00–$1.55, with six of the seven processor defendants for which information was in the record posting the same in-season prices of $1.00 for the bulk of the season, between June 25 and July 23.

In 1990 five of the seven processor defendants posted initial in-season prices of $1.00, and only Ocean Beauty and Icicle deviated from these prices during the season.

In 1991 the strike was resolved after six of the seven processors agreed to pay $0.70. Ocean Beauty matched this price retroactively.

In 1992 six of the seven processor defendants paid $1.00 as an in-season price, while Ocean Beauty paid $1.05.

In 1993 all seven processor defendants initially paid $0.60 as an in-season price, while Ocean Beauty increased its price during the season to $0.75.

In 1994 in-season prices varied between processor defendants in a range of $0.55–$1.00, while five of the seven processor defendants paid initial prices of $0.40–$0.65, and all seven raised the price to $0.80 as of July 13 and raised the earlier price retroactively to $0.50–$0.65.

In 1995 in-season prices varied between processor defendants in a range of $0.70–$0.80, with three processors paying $0.73 and two paying $0.70 by the end of the season.

96. *See Petruzzi's*, 998 F.2d at 1244.

other Nissui document stated that the major processors "show signs that their [in-season] price will start at $1.00/lb." Also, the intention to bring the initial $1.25 price down to $1.00 could have been discussed by employees of Nelbro and Peter Pan, and Nelbro and Marubeni. Notes from these stated: "Two-tier price" and "F[ish] P[rice] Bay ... 1.00."

In 1990 an employee of a nonparty processor testified that a Nelbro representative told him on July 1, 1990, the same day that prices were posted, that Trident had "confirmed" with Nelbro that "[Trident was] paying $1.00" and that, for the season, "[t]hey were going to pay between $1.00 and $1.50."

In 1992, five days before Nelbro posted its $1.00 price, notes from a June 17 meeting between Nelbro and Peter Pan state: "Bay—advance 1.00; close 22nd," which tends to show that this price intention was communicated to Peter Pan by Nelbro.

■ Evidence of collusive interdefendant communications is a "plus factor," [97] and the evidence of future price discussions noted here qualifies as such [98] because it tends to show that defendants communicated to each other their intentions for future prices, which would be necessary to fix prices for the salmon that the defendants were buying.

iii. *Pressure applied on nonparty processors Woodbine and Baypack, and on nonparty importer Shin Nishoku*

The plaintiffs' evidence tends to show that defendant processors applied pressure on smaller processors and importers in an apparent attempt to force them to lower their prices to the prices paid by the defendant processors.

■ In 1990 and 1991 nonparty importer Mitsui told Woodbine, a small nonparty processor, that its in-season prices were too high and that Trident and Wards Cove had complained about these prices.[99] Other evidence tends to show that Icicle and Nelbro were concerned. Mitsui threatened Woodbine with termination of their business relationship, and Woodbine did lower the prices as a result, matching the prevailing prices used by the defendants in 1991 and 1992.

In 1995 Nelbro representatives complained to Baypack, another small nonparty processor, about its higher in-season prices. The Nelbro representative told Baypack that Baypack's higher prices would "damage" Nelbro's "neighbors"—Ocean Beauty, Trident, and Unisea—by "taking away their fishermen." The Nelbro representative told Baypack that a Trident representative had said "he was going to bury [Baypack]." Also, a Nelbro representative "accused [Baypack] of screwing up the industry by paying an outrageous cash price."

Finally, other evidence concerns pressure exerted in 1990 on nonparty importer Shin Nishoku, which bought fish from a nonparty processor. The nonparty processor used a

---

97. *See Petroleum Prods.*, 906 F.2d at 445–47, 452–55; *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033–37 (8th Cir.2000); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir.1987); *Wilcox v. First Interstate Bank of Oregon*, 815 F.2d 522 (9th Cir.1987).

98. Authorities cited by the defendants are irrelevant and do not stand for the proposition that evidence of verification of future prices is not a "plus factor." *See Blomkest Fertilizer*, 203 F.3d at 1033–34 (evidence of price verifications and discussions at trade shows and in other contexts is not evidence of conspiracy because there is no evidence that verifications had impact on pricing); *In re Citric Acid Litig.*, 191 F.3d 1090, 1099 (9th Cir.1999) (defendant's participation in industry organization was "legitimate" because it "served the perfectly legal purpose of guaranteeing the reliability of ... aggregate statistics on worldwide market conditions").

99. The superior court held that some of the Woodbine representative's testimony concerning statements made to her by Mitsui were inadmissible hearsay. In particular, the superior court held that testimony concerning statements by Mitsui about things said to Mitsui by other processors was double hearsay not covered by any exception. However, the plaintiffs do not rely on these statements for the truth of the matters asserted; rather, the plaintiffs seek to use them to show that the statements were made to exert pressure in the course of an antitrust conspiracy to fix prices. Therefore, the statements are not hearsay. *See* Alaska R. Evid. 801(c); *Stewart–Smith Haidinger, Inc. v. Avi Truck, Inc.*, 682 P.2d 1108, 1119 (Alaska 1984) ("Where testimony is offered to establish that a statement was made, rather than to prove its truth, the hearsay rule does not apply.").

tramper supplied by Nichiro, and a Peter Pan representative expressed concern to Nichiro about the high prices paid by Shin Nishoku and its processor. The Peter Pan representative "expressed in the strongest possible terms that that relationship is total[ly] contrary to the good of Peter Pan and must be broken off...." Subsequently, Nichiro terminated its services to the small processor.

■ Evidence of attempts to control or influence the behavior of independent, nondefendant buyers who threaten the conspiracy is a plus factor,[100] and the evidence of pressure exerted on small processors and importers noted here qualifies as such.[101] This evidence tends to show that defendant processors and importers collaborated to exert pressure on smaller processors and importers who offered higher salmon prices and threatened the stability of the lower prevailing market prices in Bristol Bay.

iv. *The "Okaya Action Plan" for 1991*

The plaintiffs presented evidence that tends to show that in December 1990 Okaya representatives presented documents to Wards Cove and Nelbro that suggested "mutual cooperation" between processors and importers. The document presented to Wards Cove noted: "We are assure[d] that Wards Cove Packing as a leader of this industry can establish reasonable FOB prices by enforcing to control the ground prices." The document

presented to Nelbro stated that "we believe [Wards Cove's] prices can be very useful for our reasonable pricing for the Japanese buyers every season."

■ As already noted, evidence of a traditional conspiracy agreement is a "plus factor."[102] However, as the defendants point out, the evidence presented by the plaintiffs does not qualify as such unless there is evidence of both an invitation to collude, as well as acceptance of that invitation.[103] The plaintiffs' evidence constitutes a "plus factor" because it tends to show that there was an invitation to collude and that Wards Cove and Trident accepted that invitation. The documents presented by Okaya provide evidence tending to establish the invitation. Acceptance can reasonably be inferred from the evidence that Wards Cove set a low initial price in 1991 before other defendant processors,[104] from the evidence that Trident representatives "agreed" with Mitsui's suggestion of a $0.50 initial price in a February 1991 meeting, and from the evidence that Trident and Wards Cove applied pressure on Woodbine by complaining to Mitsui. Therefore, the evidence concerning the "Okaya Action Plan" constitutes a "plus factor." The evidence of "plus factors," along with the evidence tending to establish "conscious parallelism," creates issues of material fact that require reversal of both collective motions for summary judgment.[105,106]

---

100. *See Petroleum Prods.,* 906 F.2d at 455–60.

101. The defendants' claim that this evidence is not direct evidence of conspiracy is irrelevant because even if there is no evidence that the smaller processors and importers reached any agreements with the defendants, the evidence that the defendants collectively asserted pressure on them *alone* qualifies as a "plus factor." Also, the weight of the evidence is irrelevant. The evidence, even if only of "isolated incident[s]," tends to show that some defendant processors and importers attempted to influence the behavior of independent processors and importers who threatened the conspiracy.

102. *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1244 (3d Cir. 1993).

103. *See In re Citric Acid Litig.,* 191 F.3d at 1098.

104. Evidence in the record indicates that Wards Cove started the 1991 season with an open ticket,

and set an initial price of $0.50 on June 29. Peter Pan also set an initial price of $0.50 on that same day. With the exception of Ocean Beauty, no other defendant processor set an initial price until the next day, when NPPI matched that price.

105. Because we reverse the grant of summary judgment, we need not reach the issue of whether the superior court properly denied the defendants' motion for fees and costs.

106. We reject the importer defendants' arguments that summary judgment should be affirmed even if the *Matsushita* analysis shows that there are material issues of fact as to the existence of a conspiracy.

First, the importers contend that summary judgment should be affirmed because the plaintiffs have failed to present evidence of agreements between importers and processors on specific prices or price levels. However, the au-

## C. *The Plaintiffs Properly Pled Their "Alter Ego" Theory of Liability.*

Because we reverse the grant of summary judgment, we must reach a second issue raised by the plaintiffs—whether the plaintiffs' "alter ego" theory of liability for three importer defendants was properly pled under Civil Rule 8(a).[107] Under this corporate "alter ego" theory, the plaintiffs seek to hold three of the defendant importers liable (Marubeni, Nissui, and Nichiro) for the actions of defendant processors (respectively, NPPI, Unisea, and Peter Pan) that are wholly owned subsidiaries of these importers.

The superior court affirmed the discovery master's order that ruled that the plaintiffs did not properly plead corporate "alter ego" claims, and therefore discovery was limited to exclude these claims. The plaintiffs ask us to reverse this ruling.

In their fourth amended complaint, the plaintiffs did not explicitly mention any theory of corporate veil piercing. Instead, the complaint noted in each case that the processor was the subsidiary or agent of the importer:

> Upon information and belief, defendant [NPPI] is a Washington corporation.... Upon information and belief, until 1994 said defendant was wholly owned and con-

trolled by, and/or was the agent of [Marubeni] ... and since 1994 has been wholly owned and controlled by and/or an agent of principal/defendant [Marubeni] ... and another corporate subsidiary of [Marubeni].

The complaint contains similar statements for Peter Pan/Nichiro and Unisea/Nissui.[108] Also, the complaint claims that the importers were the "principals of," and controlled the actions of the subsidiaries, and were "liable for the actionable ... conduct complained of" on the part of their subsidiaries:

> [Marubeni] did exercise or retained the right to exercise control over and was the principal of [NPPI].... [Marubeni] has assumed and/or is responsible for the liabilities and/or the contingent liabilities of [NPPI] ... regardless of the date of the culpable acts alleged herein, and is liable for the actionable and culpable conduct complained of herein.

Similar language exists also for Peter Pan/Nichiro and Unisea/Nissui.[109]

Below, the discovery master held that the "alter ego" claim was not adequately pled. The master determined that our decision considering similar circumstances in *Murat v. F/V Shelikof Strait*[110] is distinguishable, and the master noted that federal cases considering similar circumstances require, at a

---

thority cited in support of this proposition, *Business Electronics Corp. v. Sharp Electronics Corp.*, applies only to conspiracies consisting of "vertical restraints." 485 U.S. 717, 735–36, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). However, the conspiracy alleged by the plaintiffs, involving both processors and importers and supported by evidence in the record, is a "horizontal," or "interbrand" conspiracy. *See Ezzo's Invests., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 986–87 (6th Cir.2001); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir.2000).

Second, the importers note that it is impossible for an importer and its subsidiary to conspire to restrain trade. This is irrelevant, even if true, because the evidence that raises a material issue of fact concerning a conspiracy tends to show that importer defendants conspired with processors other than their subsidiaries.

**107.** Civil Rule 8(a) provides that "[ a] pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim or third-party claim, shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks."

**108.** "Upon information and belief, defendant [Peter Pan] is a foreign corporation.... Upon information and belief, said defendant is wholly owned and controlled by, and/or is the agent of defendant/principal [Nichiro].... Upon information and belief, defendant [Unisea] is a foreign corporation ... and is wholly owned and controlled by, and/or is the agent of defendant/principal [Nissui]."

**109.** "[Nichiro] did exercise or retained the right to exercise control over and was the principal of [Peter Pan].... [Nichiro] has assumed and/or is responsible for the liabilities and/or the contingent liabilities of [Peter Pan] ... regardless of the date of the culpable acts alleged herein, and is liable for the actionable and culpable conduct complained of herein.... [Nissui] has assumed and/or is responsible for the liabilities and/or the contingent liabilities of [Unisea] ... regardless of the date of the culpable acts alleged herein, and is liable for the actionable and culpable conduct complained of herein."

**110.** 793 P.2d 69 (Alaska 1990).

minimum, some of the "conclusory references associated with the corporate piercing doctrine or sufficient factual allegations from which defendants could infer a piercing claim." Since the plaintiffs' complaint failed to live up to this standard, the "alter ego" claims were not adequately pled.

The plaintiffs request reversal of the discovery order. The defendants, on the other hand, note that the complaint failed to sue the importer defendants "in their capacities as shareholders" of the subsidiaries, and they therefore claim that the discovery order should be upheld.[111]

The superior court and discovery master did not have the benefit of our recent decision in *McCormick v. City of Dillingham*,[112] which requires reversal of the superior court's ruling in this case. In *McCormick*, the City of Dillingham sued a corporation and its shareholder to collect unpaid taxes and fees.[113] The superior court conducted a bench trial and pierced the corporate veil to allow recovery from the shareholder.[114] The shareholder claimed that the corporate veil theory was inadequately pled, but we rejected that argument.[115] The complaint in *McCormick* did not specifically request piercing of the corporate veil.[116] However, the initial complaint named the shareholder as the sole defendant, and an amended complaint named the corporation as an additional party after the shareholder "replied that he was only an employee of Hillbilly Enterprises."[117] We held that the "alter ego" theory was adequately pled:

[I]f a party has notice of the conduct for which the opposing party is seeking relief, the opposing party may recover under any theory supported by the evidence.... Dillingham alleged in its first complaint that [the shareholder] had failed to pay city

taxes, fees, and penalties, stating that it would seek payment from [the shareholder]. [The shareholder] therefore had sufficient notice.[118]

■ Like the complaint in *McCormick*, the complaint in this appeal did not specifically request piercing of the corporate veil, but it did name the importers as defendants, and it stated that it would seek recovery from those defendants for the actions of the subsidiaries. And the importers certainly "ha[d] notice of the conduct for which the opposing party is seeking relief,"[119] since they were independently sued as conspirators, and the complaint expressly alleged that they were "responsible for the liabilities" of their wholly owned subsidiaries and were "liable for the actionable and culpable conduct" that they allegedly committed. Therefore, the plaintiffs' "alter ego" theory was adequately pled.

### D. *Alaska Statute 45.50.588 Limits the Recoverable Damages in this Case.*

The defendants, as cross-appellants, also appeal the superior court's ruling allowing the plaintiffs to recover for damages for conduct that took place beginning in 1989. The plaintiffs, along with amici curiae States of Alaska, Hawaii, Minnesota, Nevada, New Mexico, and West Virginia, ask this court to uphold that ruling.

The plaintiffs brought suit in June 1995. The plaintiffs seek damages for conduct that took place from 1989 through 1995. The applicable statute of limitations is AS 45.50.588:

An action to enforce a claim arising under AS 45.50.562—45.50.596 is barred unless commenced within four years after the claim accrues.... For the purpose of this

---

**111.** The importers also argue that "plaintiffs' alter ego theory is invalid as a matter of law." However, the superior court never found that the alter ego theory was invalid on its merits; it only affirmed a discovery order that found that the theory was inadequately pled. Thus, the superior court has not had an opportunity to rule on the factual and legal issues of the alter ego claim.

**112.** 16 P.3d 735 (Alaska 2001).

**113.** *See id.* at 737.

**114.** *See id.*

**115.** *See id.* at 743.

**116.** *See id.*

**117.** *Id.* at 743.

**118.** *Id.*

**119.** *Id.*

section, *a claim for a continuing violation is considered to accrue at any time during the period of the violation.*

(Emphasis added.) The superior court held that the underlined portion means that the statute of limitations does not begin to run until "the last act in furtherance of the conspiracy is completed." Therefore, "the plaintiffs can recover damages that occurred more than four years before the filing of the complaint," including damages for acts in 1989. The superior court based its decision on the explicit language of AS 45.50.588 and on the rule of statutory construction that no language in the statute should be rendered meaningless. The defendants appeal this ruling, claiming that AS 45.50.588 allows the statute of limitations to be tolled, but that recoverable damages are limited to those traced to acts that took place only four years or less before suit was filed.

The defendants claim that the language of AS 45.50.588 "does not address the scope of damages that a plaintiff may recover" because the last sentence of AS 45.50.588 tolls claims for continuing violations but is silent as to whether damages may be recoverable for the whole continuing conspiracy. The implication is that the language of AS 45.50.588 is ambiguous and that the legislative history of that statute will be decisive.

The plaintiffs respond by claiming that "[t]he point of [the statute] is to establish the periods for which damages are available." The plaintiffs claim that the plain meaning of the statute gives them "the right to file an action for damages seeking recovery for injuries caused by a continuing conspiracy at any time during its continuation." The implication is that once the plaintiffs file suit, damages for the whole conspiracy are recovera-ble. So, the plaintiffs reject the defendants' attempt to distinguish the right to sue, which is plainly tolled, from the right to collect damages, which the defendants claim is not addressed by the plain language of AS 45.50.588.

We agree with the defendants. One of the primary purposes of a statute of limitations is to prevent past dubious deeds from hanging like a sword of Damocles over the heads of potential defendants.[120] A corollary of this principle is that a statute of limitations encourages potential plaintiffs to file their suits in a timely fashion.[121] The language in AS 45.50.588, providing that "a claim for a continuing violation is considered to accrue at any time during the period of the violation," does not, as the superior court held, require that recovery be granted going all the way back to the initial transgression, which in the present case would be 1989. Rather, the passage in question merely holds that the statute of limitations may begin "*at any time*" while the violation is ongoing.

We hold that AS 45.50.588 limits recovery for damages to four years prior to the time at which the suit was filed. A "continuing violation" means that there are a series of related acts causing damage to a plaintiff and that each successive act marks the accrual of a new claim; it does not mean that the damages suffered before the earliest allowable accrual date under the applicable statute of limitations may be recovered.[122] Moreover, we reject the ruling of the superior court that "[t]he four year statute of limitations does not begin to run on any claims arising out of a conspiracy until the last act in furtherance of the conspiracy is completed." We therefore hold that the accrual date

120. *Poster Exchange, Inc. v. National Screen Serv. Corp.*, 517 F.2d 117, 127 (5th Cir.1975) ("The function of the limitations statute is simply to pull the blanket of peace over acts and events which have themselves already slept for the statutory period, thus barring the proof of wrongs embedded in time-passed events.").

121. *See Haakanson v. Wakefield Seafoods, Inc.*, 600 P.2d 1087, 1090 (Alaska 1979) ("Statutes of limitation serve ... 'to encourage promptness in the prosecution of actions and thus avoid the injustice which may result from the prosecution of stale claims. Statutes of limitations attempt to protect against the difficulties caused by lost evidence, faded memories and disappearing witnesses.' ") (quoting *Byrne v. Ogle*, 488 P.2d 716, 718 (Alaska 1971)).

122. *See Poster Exchange*, 517 F.2d at 128 ("[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action.... Poster here is obliged to demonstrate some act of the defendants during the limitations period.").

in AS 45.50.588 lies four years prior to the date on which the suit is filed, absent another reason that would result in the tolling of the statute of limitations. Because this case commenced on June 1, 1995, only those damages suffered after June 1, 1991 can be recovered if the plaintiffs prevail at trial.

In reaching this conclusion, we are following the precedent we established in *Oaksmith v. Brusich*, where we held that the purpose of the continuing violation doctrine is to avoid the sometimes harsh rule that a claim is measured from the initial wrong:

> The court held that Daniel Brusich's actions constituted a pattern of conduct analogous to [a] continuing trespass or nuisance situation[ ].... Under theories of continuing trespass or nuisance, each harmful act constitutes a · new cause of action for statute of limitations purposes and, therefore, the accrual of a cause of action is not measured from the date of the initial trespass so as to bar the entire action. However, while later continuing acts may prevent the running of the statute of limitations on the claim, damages cannot be recovered for the initial time-barred acts.[123]

Placing the date of accrual for a continuing violation at the statutory period prior to the date suit was filed retains the purpose of a statute of limitations while also giving potential plaintiffs a reasonable chance at recovery.

We find further support for our conclusion in *Zenith Radio Corp. v. Hazeltine Research*,[124] a United States Supreme Court decision interpreting 15 U.S.C. § 15b.[125] In *Zenith*, the Court considered a situation in which a plaintiff brought suit in 1963 for damages suffered between 1959 and 1963.[126] Noting that some of these damages were the result of acts that occurred long before 1959, the Court concluded that suit must commence within the applicable statute of limitations measured from the injurious act.[127] The Court held that in the course of a "continuing conspiracy," each act of the conspiracy is a separate cause of action that accrues for the plaintiff and that the limitations period starts running on each cause of action as soon as the act is committed.[128] The effect, then, of a continuing violation, is to provide a new, and perhaps perpetually rolling, date from which the statute of limitations may begin.[129] It does not, however, suspend or toll the running of the statute of limitations on those previous events. Consequently, the statute of limitations functions as an outer limit of the damages that can be recovered, since any damages suffered prior to that

---

123. 774 P.2d 191, 200 n. 10 (Alaska 1989) (citations omitted).

124. 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

125. 15 U.S.C. § 15b provides in relevant part: "Any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued."

There is evidence in the legislative history that the Alaska Antitrust Act was adopted to be parallel with federal law. An analysis of the original senate bill, appearing in the Senate Journal, indicated explicitly that the state statutes were in part modeled after federal statutes. *See* Senate Journal, March 31, 1975 at 585–588 ("The operative language of [what would become AS 45.50.562] is identical to § 1 of the Sherman Antitrust Act.... [U]se of the same language in this bill [will] have the advantage of bringing with it an extensive body of case law to aid state courts in its interpretation.").

126. *See Zenith*, 401 U.S. at 333, 91 S.Ct. 795.

127. *Id.* at 327–28, 338, 91 S.Ct. 795.

128. *Id.* at 338, 91 S.Ct. 795 ("In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.").

129. *Zenith*, 401 U.S. at 338–39, 91 S.Ct. 795 ("[E]ach separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion.").

period are barred by the statute of limitations.[130]

The Supreme Court reached a similar conclusion in *Hanover Shoe v. United Shoe Machinery*.[131] There, the Court found that United Shoe was liable for monopolization by insisting on leasing its machinery rather than selling it.[132] This practice had been going on continuously since 1912.[133] The Court held:

> We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. . . . Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on Hanover. Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.[134]

The Court also remarked that "Hanover is entitled to damages for the entire period permitted by the applicable statute of limitations."[135]

Applying the reasoning of these decisions to the present case yields the conclusion that suit for a continuing violation may take place at any time during which the violation was ongoing but that recovery is limited to the period prior to the filing of suit prescribed by the applicable statute of limitations. This is the holding we reach today.[136] The superior court is directed upon remand to limit any damages calculations to those damages suffered after June 1, 1991.

## V. CONCLUSION

Because the plaintiffs have presented evidence that raises material issues of fact as to the existence of an antitrust conspiracy involving some or all of the defendants, we REVERSE the superior court's ruling granting summary judgment to all defendants. Because the plaintiffs properly pled their

**130.** *See* 401 U.S. at 339, 91 S.Ct. 795 ("[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action.").

**131.** 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

**132.** *Id.* at 487–88, 88 S.Ct. 2224.

**133.** *Id.* at 502 n. 15, 88 S.Ct. 2224.

**134.** *Id.* (citation omitted).

**135.** *Id.* at 502, 88 S.Ct. 2224. *See also Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299, 1300–01 (9th Cir.1986) (holding that plaintiffs could recover for damages from conspiratorial acts during the statutory period even though the conspiracy was formed prior to the statute of limitations).

**136.** Amici curiae States of Alaska, Hawaii, Minnesota, Nevada, New Mexico, and West Virginia relied upon the holding of the federal district court in *Robert's Waikiki U–Drive, Inc. v. Budget Rent–A–Car Systems, Inc.* involving fly-drive agreements that were allegedly in violation of a Hawaii antitrust statute, with the applicable statute of limitations worded similarly to AS 45.50.588. 491 F.Supp. 1199 (D.Haw.1980). Hawaii Revised Statute § 480–24 (1976) pro-vides: "Any action to enforce a cause of action arising under this chapter shall be barred unless commenced within four years after the cause of action accrues. . . . For the purpose of this section, a cause of action for a continuing violation is deemed to accrue at any time during the period of the violation." The court held that the claim was not barred by the statute of limitations because it was an alleged continuing violation that began more than four years before the plaintiff filed suit. 491 F.Supp. at 1229. The court further held that damages for any acts that were part of that continuing violation may be recoverable, even if the acts occurred more than four years before the suit was filed. *Id.* The court based its decision on the plain language of the Hawaii statute, without reference to its legislative history or any other authorities. *See id.* A similar result was reached in *Anzai v. Chevron Corp.*, holding that "the language [of Hawaii Revised Statute § 480–24] plainly appears to permit recovery for the entire period of a continuing conspiracy." 168 F.Supp.2d 1180, 1183 (D.Haw.2001). However, the district court also noted that "apparently no state appellate court from either Hawaii or any of those eleven other states [with similarly worded continuing violations statutes] has yet issued a published opinion interpreting the key language." *Id.* at 1184. The district court even quoted from the superior court decision in the present case and noted that this decision was on appeal to the Alaska Supreme Court. *Id.* With due respect to the Hawaii District Court, we disagree with *Robert's* and *Anzai* and believe that they conflict with the continuing violations doctrine as generally understood and as reflected in the case law that we have discussed in this opinion.

"alter ego" theory of liability, we REVERSE the superior court's ruling limiting discovery to exclude this claim. We REVERSE the holding of the superior court that AS 45.50.588 allows recovery for damages back to 1989 and hold instead that damages are limited to the four years prior to the filing of the suit. We REMAND to the superior court for further proceedings consistent with this opinion.

EASTAUGH and CARPENETI, Justices, not participating.